UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SEASIDE NATIONAL BANK & TRUST,

    Plaintiff,

v.

CASE NO.:

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA,

    Defendant.
_____/

## PLAINTIFF'S COMPLAINT

NOW COMES Plaintiff Seaside National Bank & Trust ("Seaside"), by and through its attorneys, and for its complaint against Travelers Casualty and Surety Company of America ("Travelers"), respectfully states as follow:

### NATURE OF THE ACTION

1.    This is an action against Travelers regarding insurance coverage for Seaside's loss of approximately $5 million dollars resulting directly from a fraudulent scheme involving forgery of multiple security agreements. Travelers is wrongfully applying its insurance provisions in a hyper-technical way in an effort to avoid covering a loss under a financial institution bond issued to Seaside, and which a plain reading of the financial institution bond shows should be covered.

1

## PARTIES

2.  Seaside is a Florida corporation with its principal place of business at 201 S. Orange Ave., Orlando Florida 32801. Seaside is listed as a Named Insured under the subject financial institution bond issued by Travelers.

3.  Travelers is a company organized under the laws of Connecticut with its principal place of business located in Connecticut. Travelers is authorized to sell insurance in the state of Florida and, on information and belief, is actively engaged in the business of selling insurance both in Orange County and throughout the state of Florida. Travelers issued the subject financial institution bond to Seaside at Seaside's principal address in Orlando, Florida.

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds $75,000 exclusive of interest and costs, and the parties are citizens of different states.

5.  This Court has personal jurisdiction over the Travelers because Travelers: (1) is an authorized insurer in the state of Florida, (2) generally transacts business throughout the state of Florida, and (3) contracted to insure a Florida corporation with its principal place of business in this judicial district.

6.  Venue is properly placed under 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

7.  On or about July 2018, Mr. David J. Ridling ("Mr. Ridling") contacted Seaside regarding the possibility of obtaining financial loans from Seaside.

8. Mr. Ridling represented to Seaside that he owned two brokerage accounts held at the financial investment management firm Charles Schwab & Co. Inc. ("Schwab"), one Personal Account in his own name holding assets in the approximate amount of $10,000,000 and a Joint Account holding assets in the approximate amount of $48,000,000.

9. Mr. Ridling provided Seaside with several altered, falsified and forged documents in order to support its representations regarding the assets in his Schwab accounts.

10. Mr. Ridling also created a false identity and at times portrayed himself (or hired someone to act) as Mr. Victor Solis ("Mr. Solis"), who Mr. Ridling represented was his investment manager at Schwab.

11. Several of the discussions regarding the loans involved the purported Mr. Solis.

12. The real Mr. Victor Solis is a registered broker with FINRA; however, he is not and has never been associated with Schwab. (A copy of the FINRA BrokerCheck Report on the real Mr. Solis is attached as Exhibit A.)

13. On September 10, 2018, Seaside made a $3,000,000 loan to Mr. Ridling (the "$3 Million Loan"), and a $2,000,000 loan to Mr. Ridling and Blue Cypress Grain, LLC (the "$2 Million Loan") (collectively, the "Loans"), based upon Mr. Ridling's fraudulent representations and forged documents, including a $3 Million Security Agreement and a $2 Million Security Agreement (collectively, the "Security Agreements").

**The $3 Million Loan**

14. With respect to the $3 Million Loan, Seaside and Mr. Ridling entered into a *Business Loan Agreement* dated September 10, 2018. (A copy of the *Business Loan Agreement* is attached as Exhibit B.)

15. To evidence the $3 Million Loan, Mr. Ridling executed a *Revolving Line of Credit Promissory Note* dated September 10, 2018, in the original principal amount of $3,000,000 and delivered the promissory note to Seaside. (A copy of the *Revolving Line of Credit Promissory Note* is attached as Exhibit C.)

16. As security for the $3 Million Loan, Mr. Ridling executed a *Pledge and Security Agreement of Asset Account* dated September 10, 2018, in favor of Seaside and delivered the security agreement to Seaside (the "$3 Million Security Agreement"). (A copy of the $3 Million Security Agreement is attached as Exhibit D.)

17. The $3 Million Security Agreement attaches as an exhibit a *Pledged Asset Account Agreement* purportedly signed by Mr. Solis. (*See* Exhibit D.)

18. Mr. Ridling also executed a *Limited Power of Attorney for Investment Advisor*, which lists Mr. Solis' purported information. The *Limited Power of Attorney for Investment Advisor* is attached as an exhibit to the $3 Million Security Agreement. (*See* Exhibit D.)

19. Both the *Pledged Asset Account Agreement* and the *Limited Power of Attorney for Investment Advisor*, which form part of the $3 Million Security Agreement, indicate that Mr. Solis was acting on behalf of Schwab, with Mr. Solis identified as Schwab's "Vice President, Wealth Management." (*See* Exhibit D.)

**The $2 Million Loan**

20. With respect to the $2 Million Loan, Seaside, Mr. Ridling, and Blue Cypress Grain, LLC, entered into a *Business Loan Agreement* dated September 10, 2018. (A copy of the *Business Loan Agreement* is attached as Exhibit E.)

21. To evidence the $2 Million Loan, Mr. Ridling executed a *Revolving Line of Credit Promissory Note* dated September 10, 2018, in the original principal amount of $2,000,000 and delivered the promissory note to Seaside. (A copy of the *Revolving Line of Credit Promissory Note* is attached as Exhibit F.)

22. As security for the $2 Million Loan, Mr. Ridling executed a *Pledge and Security Agreement of Asset Account* dated September 10, 2018, in favor of Seaside and delivered the security agreement to Seaside (the "$2 Million Security Agreement"). (A copy of the $2 Million Security Agreement is attached as Exhibit G.)

23. The $2 Million Security Agreement attaches as an exhibit a *Pledged Asset Account Agreement* purportedly signed by Mr. Solis. (*See* Exhibit G.)

24. Mr. Ridling also executed a *Limited Power of Attorney for Investment Advisor*, which lists Mr. Solis' purported information. The *Limited Power of Attorney for Investment Advisor* is attached as an exhibit to the $2 Million Security Agreement. (*See* Exhibit G.)

25. Both the *Pledged Asset Account Agreement* and the *Limited Power of Attorney for Investment Advisor*, which form part of the $2 Million Security Agreement, indicate that Mr. Solis was acting on behalf of Schwab, with Mr. Solis identified as Schwab's "Vice President, Wealth Management." (*See* Exhibit G.)

**Investigation**

26. Through an investigation, Seaside learned that Schwab never received either of the Security Agreements, thereby allowing Mr. Ridling to remove assets from his Personal Schwab Account freely, which he did.

27. Seaside also learned that Mr. Solis is not, and has never been, an employee of Schwab but instead was an imposter, possibly Mr. Ridling or someone acting on his behalf. Specifically, the email account purporting to be Mr. Solis' is not associated with Schwab and the phone number used by the purported Mr. Solis in communicating with Seaside was actually a phone number controlled by Mr. Ridling. Thus, the purported signature of Mr. Solis in the Security Agreements was forged and all references to Mr. Solis in the documents were fraudulent.

28. Seaside relied in good faith on the authenticity of Mr. Solis' purported signature on the Security Agreements as a condition precedent to making the Loans to Mr. Ridling.

**The Bond**

29. Travelers issued a Financial Institution Bond with Extended Coverages to Seaside for the period of October 16, 2016 to October 16, 2019, Bond No. 049-LB-106007087 (the "Bond"). (A copy of the Bond is attached as Exhibit H.)

30. Seaside paid and Travelers accepted premium for the issuance of the Bond.

31. The Bond, subject to its terms, conditions and exclusions, affords insurance coverage for any loss resulting directly from Seaside's extension of credit in reliance on the faith of a forged security agreement.

32. The Bond states, in pertinent part, as follows:

1. Consideration Clause

"**IN CONSIDERATION** of the payment of an agreed premium and subject to the Declarations and pursuant to all the terms, conditions, exclusions and limitations of this bond, the Company agrees to indemnify the Named Insured as set forth in ITEM 1 of the Declarations (herein called Insured) for:"

\*    \*    \*

### E. SECURITIES

Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others:

1. acquired, sold, delivered, or given value, extended credit or assumed liability on the faith of any **Original Written** document that is a (an):

    a. **Certificated Security**;

    b. **Document of Title**;

    c. deed, mortgage, or other instrument conveying title to, or creating or discharging a lien on, real property;

    d. **Certificate of Origin or Title**;

    e. **Certificate of Deposit**;

    f. **Evidence of Debt**;

    g. corporate, partnership, or personal Guarantee;

    h. **Security Agreement**;

    i. **Instruction**; or

    j. **Statement of Uncertificated Security**,

   that: (i) bears a handwritten signature that is material to the validity or enforceability of the security, and is a **Forgery**, but only to the extent the **Forgery** directly causes the loss; (ii) is **Altered**, but only to the extent the **Alteration** directly causes the loss; or (iii) is lost or stolen[.]

   \*   \*   \*

   Actual physical possession of the items listed in 1.a. through 1.j. above by the Insured is a condition precedent to the Insured having relied on the faith of such items. Actual physical possession of the items listed in 1.a. through 1.j. above by a correspondent **Financial Institution**, or other representative authorized to possess such items on behalf of the Insured, will satisfy the actual physical possession requirement if Loan Participation Coverage is indicated as included under Insuring Agreement E. in ITEM 5 of the Declarations.

(Exhibit H, FIB-3001 Ed. 01-16).

33. The Bond defines **Security Agreement** as "a **Written** agreement that creates an interest in personal property or fixtures and secures pay or performance of an obligation." (Exhibit H, FIB-3001 Ed. 01-16.)

34. The $3 Million Security Agreement is a written agreement that creates an interest in personal property and secures pay, and therefore constitutes a **Security Agreement**, as defined by the Bond.

35. The $2 Million Security Agreement is a written agreement that creates an interest in personal property and secures pay, and therefore constitutes a **Security Agreement**, as defined by the Bond.

36. The Bond defines **Forgery** as "signing the name of another person or organization with a handwritten signature directly applied to a **Written** document without authority, and with the intent to deceive." (Exhibit H, FIB-3001 Ed. 01-16).

37. The Security Agreements contain the purported signature of Mr. Solis without the knowledge or authority of the actual Mr. Solis and for the purpose of deceiving Seaside. Therefore, the Security Agreements bear a handwritten signature that is material to the validity or enforceability of the security, and is a **Forgery**, as defined by the Bond.

38. Mr. Ridling has failed to make payment due under any of the *Business Loan Agreements*.

39. Seaside has attempted to enforce the terms and conditions of Mr. Ridling's *Business Loan Agreements* and Security Agreements to no avail.

40. Seaside would not have made the Loans had it known that the Security Agreements were forged and only made the Loans as a direct result of the forgery.

41. Seaside would not have made the Loans without Mr. Solis' genuine signature on the Security Agreements.

42. Seaside has been damaged as a direct result of its good faith reliance on the forged Security Agreements.

43. Seaside is in actual possession of the $3 Million Security Agreement and the $2 Million Security Agreement bearing the forged signature of Mr. Solis.

44. On July 24, 2019, Seaside, through Three Shores Bancorporation, Inc., submitted a proof of loss to Travelers for losses arising out of the fraudulent scheme.

45. On September 6, 2019, Travelers declined coverage for Seaside's loss.

46. Seaside has satisfied all of the applicable terms, conditions, and other requirements of the Bond. Alternatively, compliance with the applicable terms, conditions, and other requirements in whole or in part has been waived, excused, or is unnecessary for other reasons.

**Retention of Counsel**

47. Seaside has retained the law firm of Hunton Andrews Kurth LLP and its attorneys to represent Seaside in this action and has agreed to pay it reasonable attorneys' fees, plus all expenses incurred, for its services.

## COUNT I – BREACH OF CONTRACT

48. Seaside re-alleges the preceding paragraphs as if fully set forth herein.

49. At all material times, Seaside was insured under the Bond, which is a binding, valid, and enforceable contract under Florida law.

50. The Bond, subject to its terms, conditions and exclusions, provides insurance coverage for loss sustained by Seaside as a result of extending credit on the faith of forged Security Agreements.

51. None of the terms, provisions, conditions, or exclusions in the Bond apply to bar coverage.

52. Travelers has materially breached its payment obligations under the Bond by refusing to pay for certain covered losses incurred by Seaside as a direct result of a covered forgery.

53. As a direct, proximate, and natural result of Travelers' failure to pay for covered losses, Seaside has sustained damages including, but not limited to, the proceeds due under the Bond that have not been paid, attorneys' fees, interest and costs.

54. Seaside has retained the undersigned law firm and has incurred attorneys' fees and costs for bringing this action.

WHEREFORE, Plaintiff Seaside National Bank & Trust demands judgment against Defendant Travelers Casualty and Surety Company of America, for damages, pre- and post-judgment interest, attorneys' fees pursuant to Fla. Stat. § 627.428, costs, and any further relief this Court deems equitable, just, and proper.

## JURY DEMAND

Seaside hereby demands trial by jury.

| | |
|---|---|
| Dated: January 13, 2020 | HUNTON ANDREWS KURTH LLP |
| | |
| | */s/ Walter J. Andrews* |
| | Walter J. Andrews |
| | Fla. Bar No. 84863 |
| | Daniel Hentschel |
| | Fla. Bar No. 123564 |
| | HUNTON ANDREWS KURTH LLP |
| | 1111 Brickell Avenue, Suite 2500 |
| | Miami, Florida 33131 |
| | Tel: (305) 810-6407 |
| | Facsimile: (305) 810-2460 |
| | wandrews@HuntonAK.com |
| | dhentschel@HuntonAK.com |
| | |
| | *Attorneys for Plaintiff, Seaside National Bank & Trust* |